UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DERRICK A. SPATORICO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:19-cv-30090-KAR |
| | ) | |
| | ) | |
| EGAN, FLANAGAN & COHEN, P.C., | ) | |
| THOMAS E. DAY, ESQ., and | ) | |
| STEPHEN E. SPELMAN, ESQ., | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
(Dkt Nos. 76 and 79)

ROBERTSON, U.S.M.J.

## I.  INTRODUCTION

This legal malpractice action is before the court on cross-motions for summary judgment by the defendants Egan, Flanagan, & Cohen ("EFC"), Thomas E. Day ("Day"), and Stephen Spelman ("Spelman") (collectively, "Defendants") and the plaintiff Derrick A. Spatorico ("Plaintiff").  For the reasons set forth below, Defendants' motion for summary judgment (Dkt. No. 76) is GRANTED, and Plaintiff's motion for partial summary judgment (Dkt. No. 79) is DENIED.

## II.  LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018)

(citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is 'material' when its (non)existence could change a case's outcome.  *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'"  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute."  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*."  *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) (citing *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 141 (1st Cir. 1985)).  "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  *Id*. (citing *Wiley*, 762 F.2d at 141).

### III.    FACTUAL BACKGROUND

In 2015, Terry Kilburn ("Terry") and Nancy Kilburn ("Nancy") were embroiled in a bitter divorce action in Florida (Pl. SOF ¶ 8).  On April 14, 2015, the Florida court issued an order providing that: "[N]either party is to hide, sell, give away, hypothecate or otherwise dissipate any marital asset without stipulation of the parties or upon further order of this Court" (Pl. SOF ¶ 8).  At the time, Terry and Nancy each held 40.5% of the shares of Tracers, Inc. ("Tracers"), with the remainder of shares held by Michael Barnard ("Barnard") (13.5%) and Paul Harrington ("Harrington") (5.5%) (Def. SOF ¶¶ 11-12; Pl. SOF ¶ 1).  Terry was one of the two directors of Tracers and served as its secretary and treasurer; Nancy was the other of the two directors and served as its president (Pl. SOF ¶ 7).

Over the years, several companies had expressed interest in buying Tracers (Def. SOF ¶ 33).[1]  Tracers' four shareholders agreed that any sale of Tracers would be done as a stock sale, as opposed to an asset sale, because of the adverse tax consequences that would result from an asset sale (Def. SOF ¶ 34).  Potential buyers were informed by the shareholders that they were not interested in an asset sale but would consider a stock sale involving the sale of all of Tracers' shares and the wholesale transfer of the company (Def. SOF ¶¶ 35-36).[2]

---

[1] Defendant's SOF ¶ 33 relies in part on the deposition testimony of Terry.  Plaintiff argues that Terry's deposition testimony should not be considered because, upon information and belief, Terry did not review and/or sign it and, also upon information and belief, the officer before whom the testimony was taken failed to sign it as well.  Plaintiff cites to no authority.  The court rejects Plaintiff's argument and will consider Terry's deposition testimony.  First, Fed. R. Civ. P. 30(e) only requires a signature of the deponent if review of the transcript is requested before the deposition is completed and changes are made.  *See id*.  Moreover, Federal Rule of Civil Procedure 56(c)(2) allows "[a] party to object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56 (c)(2).  Plaintiff fails to explain how Defendants could not present Terry's testimony in an admissible form.

[2] Plaintiff purports to dispute each of these facts on the basis that he "lacks knowledge or information sufficient to form a belief as to the truth or falsity of that statement and, therefore,

Starting as early as 2013, Terry and Tom Murphy ("Murphy") had discussions regarding a potential merger with or acquisition of Tracers by Facterra, Inc. ("Facterra") (Def. SOF ¶ 38). In July 2015, the discussions became more serious, and it was agreed that the sale price for all of Tracers' stock would be $6,000,000 (Def. SOF ¶ 39).  Murphy, who owned 100% of the shares in Facterra and was principally involved in the negotiation process on behalf of Facterra, understood that the Tracers shareholders wanted to sell 100% of the stock so that they did not lose the tax benefit of being a Subchapter S corporation (Def. Resp. ¶ 3; Pl. SOF ¶ 1; Def. SOF ¶ 87).[3]  At the time of these negotiations, Plaintiff owned no shares of Facterra stock; instead, he was an investor in or lender to Facterra (Def. SOF ¶¶ 88-89).

In early July of 2015, Murphy sent each shareholder a draft proposed shareholder purchase agreement ("SPA") (Def. SOF ¶ 40; Pl. SOF ¶ 2).  Terry and Nancy were to receive the same consideration for their respective shares, with an initial payment of $608,100 being due on or before the closing date (Def. SOF ¶ 43; Dkt. Nos. 77-10, 77-11).  The SPAs for Terry and Nancy both contained language expressly requiring that, "closing is contingent [sic] receipt of a court order, from Hernando County Circuit, approving the sale of shares to Buyer" (Def. SOF ¶

---

denies the same" (Pl. Resp. ¶¶ 35-36).  A party does not create an issue of fact by claiming to have insufficient knowledge or information.  Local Rule 56.1 requires a party contending that there is a genuine issue to be tried to include page references to affidavits, depositions, and other documentation, which must be filed as exhibits.  Because Plaintiff has failed to properly contest these facts with citations to the record, they are deemed admitted as provided in the local rule.  This logic applies with equal force each time Plaintiff purports to dispute a fact based on insufficient knowledge or information, which he does throughout his Local Rule 56.1 statement.
[3] Plaintiff purports to dispute the fact that Murphy owned 100% of the shares in Facterra by simply stating "[d]isputed" (Pl. Resp. ¶ 87).  This is patently insufficient to create an issue of fact.  Again, Local Rule 56.1 requires a party contending that there is a genuine issue to be tried to include page references to affidavits, depositions, and other documentation, which must be filed as exhibits.  Because Plaintiff has failed to properly contest this fact with citations to the record, it is deemed admitted as provided in the local rule.  This logic applies with equal force each time Plaintiff purports to dispute a fact by simply stating that it is "[d]isputed," as he does repeatedly in his Local Rule 56.1 statement.

41).  On July 6, 2015, Murphy sent Terry an email stating, in part, that "[w]e pay you $608,100 right after the judge executes a the [sic] stipulation" (Def. SOF ¶ 44).

On July 9, 2015, Terry and Nancy entered into a Partial Settlement Agreement indicating that: (1) they jointly started Tracers in 1996, prior to their marriage; (2) each owned an equal amount of shares of stock in Tracers as of the date of the agreement; (3) they had recently received an offer from Facterra to purchase all of their shares; (4) they agreed to sell the entirety of their respective shares to Facterra; and (5) their stock would not be subject to further equitable distribution by the Florida court because they would be receiving an even amount of compensation in the stock sale to Facterra (Def. SOF ¶ 42; Pl. SOF ¶ 10; Dkt. 81-1 at 161-162).

That same day, Murphy informed Terry that Facterra would not be able to make an initial payment of $608,100 as was required under the SPA (Def. SOF ¶ 45).  Instead, the initial payment amount was reduced to $100,000 (Def. SOF ¶ 46).  This was a red flag for Terry (Def. SOF ¶ 47).

Shortly thereafter, on July 17, 2015, Terry learned that Nancy and Barnard had already executed their SPAs with Facterra (Def. SOF ¶ 51; Pl. SOF ¶ 4).  Neither Terry nor Harrington had signed their SPAs (Pl. SOF ¶ 5).  This troubled Terry because Tracers had only pursued wholesale transfers of stock to potential buyers, and the negotiations with Murphy had been consistent with this course of action (Def. SOF ¶ 52).  An *en masse* sale of shares was necessary to avoid shareholders combining to sell a controlling majority interest, which would drive down the price for the remaining shareholders (Def. SOF ¶ 53).  Additionally, because Tracers was a closely held Subchapter S Corporation, it was necessary that any sale of shares to a non-qualified entity such as Facterra be done *en masse* because the ownership of any shares by Facterra, a

subchapter C Corporation, would forfeit the Subchapter S status of Tracers, which, in turn, would result in unfavorable tax consequences to its remaining shareholders (Def. SOF ¶ 54).

By around July 24, 2015, Terry had become concerned that Facterra did not have the funds to consummate the deal (Def. SOF ¶ 50).  Terry sent an email to Murphy expressing concern that "the numbers keep going down," and reminding Murphy that the terms of the partial settlement agreement required the compensation to him and Nancy to be the same (Def. SOF ¶ 48).  This was Terry's last communication with Murphy; Murphy never responded to the email or returned Terry's phone calls (Def. SOF ¶¶ 48-49).

Five days later, on July 29, 2015, Terry discovered that between June 9, 2015, and July 27, 2015, a total of $470,500 had been transferred via wire from Tracers' bank account to Facterra (Def. SOF ¶ 55).  Nancy denied knowledge of the wire transfers (Def. SOF ¶ 59).

On July 31, 2015, Terry and Harrington (collectively, "the State Court Plaintiffs") filed a complaint in the Hampden County Superior Court against Nancy, Barnard, Murphy, Plaintiff, and Facterra (collectively, "the State Court Defendants") (Pl. SOF ¶14; Def. SOF ¶¶ 8, 10). The State Court Plaintiffs sued individually and as shareholders of Tracers, asserting a claim for breach of fiduciary duty against fellow shareholders Nancy and Barnard, and seeking a permanent injunction, declaratory judgment, and money damages ("the State Court Action") (Def. SOF ¶ 20; Pl. SOF ¶ 14).

Immediately after being served with process, Plaintiff contacted EFC, a Massachusetts professional corporation engaged in the practice of law, to represent him in the State Court Action (Def. SOF ¶¶ 3, 13).  Plaintiff entered into a retainer agreement with EFC, in which EFC stated that Murphy and Facterra were also clients of the firm with respect to the matter (Def. SOF ¶¶ 14, 16; Dkt. No. 1-2 at 1).  Day, a licensed attorney in the Commonwealth of

Massachusetts, signed the agreement on behalf of EFC and was one of the principal attorneys who represented Plaintiff in the State Court Action (Def. SOF ¶ 4; Dkt. No. 1-2 at 2).  Spelman, who is likewise licensed to practice law in the Commonwealth of Massachusetts, also represented Plaintiff in the State Court Action (Def. SOF ¶ 5).  Plaintiff himself is a licensed attorney in the State of New York, where he lives and practices law (Def. SOF ¶¶ 1-2).  Plaintiff is also licensed to practice in the Commonwealth of Massachusetts (Def. SOF ¶ 2; Pl. Resp. ¶ 2).

Contemporaneous with the filing of the summons and complaint, the State Court Plaintiffs sought an *ex parte* trustee process attachment in the amount of $500,000 against Facterra's Bank of America account and, on an emergency basis, a temporary restraining order/preliminary injunction enjoining the State Court Defendants from: (a) attempting to exercise control over the corporate affairs of Tracers; (b) attempting to manage the day-to-day operations of Tracers; (c) entering onto the property of Tracers; (d) accessing the computer systems, books, or records of Tracers; and (e) making any representations to any person or entity that they (or their agents) had any interest in Tracers, any rights to control the corporate affairs of Tracers, or to act in any manner on behalf of Tracers.  The preliminary injunction further commanded the State Court Defendants to: immediately return to Tracers all assets and funds taken from it; and immediately return the executed SPAs, with signed stock proxies, to Nancy and Barnard (Def. SOF ¶¶ 18, 92; Pl. SOF ¶ 15).  The State Court Plaintiffs submitted an affidavit from Terry in support of their initial applications for relief (Pl. SOF ¶ 16).

On August 4, 2015, Nancy informed Terry that she had received $200,000 from Facterra on July 3 or 4, 2015, and $100,000 on July 21, 2015 (Def. SOF ¶ 55).  The following day, on August 5, 2015, the State Court issued a notice of hearing on the State Court Plaintiffs' initial applications to be held on August 11, 2015 (Pl. SOF ¶ 18).  EFC did not request a continuance of

the hearing date or file any papers on Plaintiff's behalf before the hearing (Def. SOF ¶ 23; Pl. SOF ¶¶ 17, 23).   Nor were any papers filed on behalf of any of the other defendants in the State Court Action before the hearing (Def. SOF ¶ 24).   The hearing was held as scheduled, with no counsel appearing on behalf of Nancy or Barnard (Def. SOF ¶¶ 22, 26, 94; Pl. SOF ¶ 25). Indeed, no counsel filed a notice of appearance on behalf of Nancy or Barnard before the hearing (Def. SOF ¶ 25).   On August 14, 2015, the State Court granted the State Court Plaintiffs' initial applications (Pl. SOF ¶ 24).   Spelman did not make a motion for reconsideration or re-argument of the August 14, 2015, order, or take an interlocutory appeal from it (Pl. SOF ¶ 26).

After the state court allowed the State Court Plaintiffs' initial applications, Terry resumed the management of Tracers' day-to-day affairs and discovered emails that showed that Nancy knew about and authorized the wire transfers from Tracers to Facterra (Def. SOF ¶¶ 60-64). Terry also discovered an email dated August 3, 2015, from Nancy to Murphy, stating:

> You did not have authority to take $435,000 out of Tracers bank accounts. No shareholder does.  That authority belongs solely to the board of directors, which did not meet and from which I did not resign, and to the Chief Executive Officer – which is still me.  My proxy did not give you the authority to violate the rights of the other shareholders, our bylaws, or Massachusetts corporate law, and you absolutely, positively did NOT have the authority to use Tracers' funds to buy Masterfiles for Facterra.

(Def. SOF ¶ 65).   Nancy went on to state, "you took more from Tracers than you gave to me so that you could use our money to finance other deals" (Def. SOF ¶ 66).   Terry also found an email exchange in which Nancy stated to the recipients that she wanted to start "keeping Terry busy," by instructing "Rich" to file a cause of action, the "legitimacy of which [wa]s completely irrelevant," but that should "bury[ ] Terry and more importantly, his attorney – in paper" (Def. SOF ¶ 67).   Finally, Terry found an email from Nancy to Murphy dated July 14, 2015, expressing concern that Terry might challenge her right to sell her shares in Facterra and

suggesting various options "so we can continue to move forward as a Facterra property" (Def.

SOF ¶¶ 68-69).  The options Nancy suggested included:

> (1) Calling a special shareholders' meeting and then calling "for a
> meeting of the Board to convene immediately upon
> adjournment of the shareholders meeting for the purposes of,"
> among other things, removing Terry as secretary and treasurer.
> However, Nancy noted that "shareholders have to fire
> directors" and that, therefore, "[i]f Terry hasn't committed to
> resigning from the board, a shareholders' meeting will have to
> be reconvened.  The language for this should NOT be in the
> meeting notice."
>
> (2) Retroactively amending the SPA to remove section 4(a) which
> provided that "[c]losing is contingent upon receipt of a court
> order, from Hernando County Circuit, approving the sale of
> shares to BUYER."
>
> (3) Retroactively amending section 4(c) of the SPA to "[e]liminate
> specifics regarding the board meeting."  Nancy noted that,
> "[w]e need to mashup a bunch of stuff from section four, but at
> a minimum (IMPORTANT) we need to amend section 4(c) to
> make it clear that any implication that I was selling a board
> vote was entirely inadvertent.  I can't commit to selling a vote
> of the board unless I'm the only board member or all board
> members are signing."

(Def. SOF ¶ 70).

On September 3, 2015, Nancy filed a motion for reconsideration, along with her own

motions for a temporary restraining order and preliminary injunction, which were denied (Def.

SOF ¶¶ 71-72).  On September 4, 2015, Day filed a motion for dismissal of the State Court

Plaintiffs' complaint based on lack of personal jurisdiction over Facterra, Murphy, and Plaintiff

and *forum non conveniens* (Pl. SOF ¶ 28).  The State Court denied the motion to dismiss on

January 21, 2016, and EFC filed on answer on behalf of Facterra, Murphy, and Plaintiff on

February 17, 2016 (Pl. SOF ¶¶ 29, 31).  Thereafter, Plaintiff directed Day to engage in settlement

negotiations with the State Court Plaintiffs to put an end to any further litigation, resulting in a final settlement agreement on April 25, 2016 (Pl. SOF ¶ 32).

On June 2, 2016, Day sent a copy of a proposed stipulation of dismissal to Plaintiff (Def. SOF ¶ 104). Plaintiff responded indicating that the stipulation was fine with him, although he did allude to having second thoughts because "we had a very strong case" (Def. SOF ¶ 105). The stipulation of dismissal was filed on June 17, 2016, and Day forwarded a confirmation to Plaintiff by email (Def. SOF ¶ 106). Plaintiff responded to Day on June 20, 2016, stating that "[o]n several occasions I have asked you for a copy of the file. To date, I am still nine [sic] in possession of the complete copy. Please send me your final statement as well as a check representing the overage and a complete copy of my file" (Def. SOF ¶ 107). Day sent a letter to Plaintiff on June 28, 2016, enclosing a complete copy of the file (Dkt. No. 86 at 86). On June 30, 2016, Day sent an email to Murphy indicating that the check went out with the final statement the previous day (Dkt. No. 86 at 87). On August 3, 2016, Thomas Murphy sent a letter to the Managing Partner at EFC thanking him for "providing us a _complete_ copy of our file pursuant to our specific request," and giving him the opportunity to put EFC's liability carrier on notice of a potential liability claim (Dkt. No. 81-1 at 555).

Plaintiff initiated this action by filing a complaint on June 28, 2019 (Def. SOF ¶ 109; Dkt. No. 1).

## IV.   DISCUSSION

### A.   Standing

Defendants argue that Plaintiff lacks standing to recover damages allegedly suffered by Facterra. Specifically, Plaintiff seeks damages of $3,000,000, consisting of the "loss of bargain on sale of Tracer shares, to be acquired by Facterra pursuant to the various shareholder

agreements among it and Terry, the late Paul Harrington, Nancy and Barnard, with a third-party

business purchaser …." According to Defendants, these damages flow from the alleged injuries

to Facterra, not to Plaintiff, and therefore, he is not entitled to recover them.[4]

Plaintiff acknowledges in his opposition that he is asserting damages of Facterra, but he

resists a determination that he lacks standing on two bases. First, he argues that Defendants have

waived the affirmative defense of standing by not raising it in their answers to the complaint.

Second, he submits an affidavit in which he purports to have standing as the assignee of

Facterra's cause of action against Defendants by virtue of a May 22, 2017, written assignment,

which he admittedly did not produce prior to the filing of dispositive motions (Dkt. No. 88 at 5;

Dkt. No. 89 at 3-11). Plaintiff avers that the assignment was made in consideration of the

approximately $400,000 he advanced on behalf of Facterra to finance the acquisition of Tracers

in July 2015, and he attaches an October 2019 email from Murphy to him referencing the

assignment to counter any claim that the assignment is a recent fabrication by him to avoid

dismissal based on standing.

Defendants counter that standing is not a waivable affirmative defense. Moreover,

Defendants argue that Plaintiff should be precluded from using the assignment pursuant to Fed.

R. Civ. P. 37(c) because he failed to identify it in his initial disclosures or to produce it in

response to specific requests calling for such documents. Finally, Defendants maintain that the

portions of Plaintiff's affidavit in which he refers to and attaches the assignment should be

stricken because they are inconsistent with his answers to interrogatories, in which he referred

---

[4] Plaintiff also seeks damages he allegedly suffered personally, consisting of $50,000 expended
in legal fees. Defendants do not argue that Plaintiff lacks standing to recover these damages,
although they contest his entitlement to them on other grounds.

only to damages he sustained, and deposition testimony, in which he testified that he had less than $50,000 invested in Facterra.

Standing is a threshold jurisdictional issue that must be resolved before examining the merits of the underlying claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). There are two elements to standing doctrine: an "'irreducible constitutional minimum,'" *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 637 (1st Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)), and a prudential component. *Id*. (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). To establish constitutional standing, "the plaintiff must show an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.'" *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). The prudential dimensions of standing "'ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked.'" *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) (quoting *Pagán v. Calderón*, 448 F.3d 16, 27 (1st Cir. 2006)).

Defendants' argument that Plaintiff lacks standing to recover the alleged damages to Facterra falls within the realm of prudential standing. "[P]rudential considerations, though important, are not as inexorable as their Article III counterparts." *Pagán*, 448 F.3d at 27. That said, the court rejects Plaintiff's claim that standing is an affirmative defense that Defendants waived by not raising it in their answers. The court could locate no authority and Plaintiff cites none supporting the proposition that lack of standing, even prudential lack of standing, is an affirmative defense. To the contrary, it is Plaintiff, as the party invoking federal jurisdiction,

who bears the burden of establishing standing.  *Lujan*, 504 U.S. at 561.  Moreover, while there is

no question that a party cannot waive constitutional standing, the First Circuit has noted a dispute

among the circuits as to whether prudential standing is waivable.  *Pharm. Rsch. & Mfrs. of Am.*

*v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001), *aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v.*

*Walsh*, 538 U.S. 644 (2003)).  Even if the First Circuit were to side with the courts finding that

prudential standing is waivable, an issue on which this court expresses no prediction, this court

would decline to find it waived under the present circumstances.  In the realm of affirmative

defenses, the First Circuit has held that "[a] district court may relax the raise-or-waive rule when

equity so dictates and there is no unfair prejudice to any opposing party."  *Shervin v. Partners*

*Healthcare Sys., Inc.*, 804 F.3d 23, 53 (1st Cir. 2015) (citing *Conjugal Partnership Comprised by*

*Jones & Jones v. Conjugal Partnership Comprised of Pineda & Pineda*, 22 F.3d 391, 400 (1st

Cir. 1994)).  Equity would dictate that no waiver be found here where Plaintiff's complaint

purports to seek recovery only of monetary damages he suffered resulting from Defendants'

alleged negligence rather than monetary damages suffered by Facterra and sought to be

recovered as an assignee of Facterra (Dkt. No. 1).  In other words, the complaint would not have

apprized Defendants of the standing issue and, thus, they cannot be faulted for not raising it

earlier.  Nor can the court conceive of any unfair prejudice to Plaintiff from addressing it now.

Thus, the court turns to the merits of the prudential standing issue.  "[E]ach element [of

standing] must be supported in the same way as any other matter on which the plaintiff bears the

burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of

the litigation."  *Lujan*, 504 U.S. at 561.  Here, Plaintiff relies entirely on the May 22, 2017,

written assignment to establish standing.  However, Plaintiff failed to identify the document in

accordance with Fed. R. Civ. P. 26(a)(1)(A), which requires a party to provide to other parties "a

copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26 (a)(1)(A)(ii).  "Failure to properly disclose [under Rule 26(a)] triggers Rule 37(c)(1): incomplete or late disclosures may preclude a party from using 'that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'"  *Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 47 (1st Cir. 2021) (quoting Fed. R. Civ. P. 37(c)(1)).  However, where there is no harm to a party, a district court is precluded from invoking Rule 37(c)(1)'s severe exclusionary penalty.  *Id*. (citing *Cruz-Vázquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 58 n.1 (1st Cir. 2010)).  "Furthermore, even when there is harm to a party, '[p]reclusion is not strictly required.'"  *Id*. (quoting *Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 91 (1st Cir. 2020)).  "Instead, '[w]hen noncompliance occurs, the ordering court should consider the totality of events and then choose from the broad universe of available sanctions in an effort to fit the punishment to the severity and circumstances of the violation.'"  *Id*. (quoting *Lawes*, 963 F.3d at 91).  The factors used to analyze whether a failure to disclose is substantially justified or harmless include: (1) the history of the litigation; (2) the sanctioned party's need for the precluded evidence; (3) the sanctioned party's justification (or lack of one) for its late disclosure; (4) the opponent-party's ability to overcome the late disclosure's adverse effects – e.g., the surprise and prejudice associated with the late disclosure; and (5) the late disclosure's impact on the district court's docket."  *Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 78 (1st Cir. 2009).  The party facing sanctions has "the burden of proving substantial justification or

harmlessness to get a penalty less severe than evidence preclusion." *Eldridge v. Gordon Bros. Grp., L.L.C.*, 863 F.3d 66, 85 (1st Cir. 2017).

Here, while Plaintiff has a real need for the document – without it, he has no claim to standing to recover the alleged damages to Facterra – Plaintiff offers no justification for his failure to automatically disclose it, or, for that matter, to refer to it in his complaint.  Plaintiff ignores that the assignment document should have been produced as an automatic disclosure and instead argues that it was non-responsive to any of Defendants' written discovery requests, and it was only Defendants' counsel's inartful and incomplete questioning during his deposition that resulted in his not disclosing it at that time.  These justifications are wholly unsatisfactory.  They ignore: (a) a party's obligation to produce, *without awaiting a discovery request*, "a copy – or a description by category and location – of all documents … that the disclosing party has in its possession, custody, or control *and may use to support its claims* ….; Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis added); and (2) a party's obligation to provide, *without awaiting a discovery request*, "a computation of each category of damages claimed by the disclosing party – *who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material … on which each computation is based* …."  Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added).  Assuming solely for the sake of argument that defense counsel's questioning was less than artful (a matter on which the court has no opinion), Plaintiff has no legitimate basis for attributing blame to defense counsel where Plaintiff failed to make the requisite disclosures that would have enabled counsel to understand the basis of Plaintiff's damages claims and focus his inquiries accordingly.

"'Discovery must not be allowed to degenerate into a game of cat and mouse.'" *González-Rivera v. Centro Médico Del Turabo, Inc.*, 931 F.3d 23, 28 (1st Cir. 2019) (quoting

*Thibeault v. Square D Co.*, 960 F.2d 239, 243 (1st Cir. 1992)).  Preclusion is an appropriate sanction here because, in addition to the critical import of the information Plaintiff elected to withhold – thereby purporting to change the measure of damages by an order of magnitude – he also displayed a cavalier attitude toward discovery deadlines by an untimely expert disclosure. On the other hand, if Plaintiff's assignment claim is allowed to stand, the court would be required, in fairness to Defendants, to reopen discovery so that Defendants could explore the validity of the assignment and the measure of alleged damages to Facterra, which would negatively impact this court's docket in a matter that has already been pending for more than three years.  Thus, while there are less severe sanctions than preclusion available, none properly address the severity and circumstances of the violation.  *See id.* at 27 ("'Surprise and prejudice are important integers in the calculus,'" as is 'what the late disclosure portends for the court's docket.'") (quoting *Macaulay v. Anas*, 321 F.3d 45, 51 (1st Cir. 2003)).  Accordingly, Plaintiff is precluded from relying on the assignment as evidence and, without it, Plaintiff cannot meet his burden of establishing standing to recover the alleged damages to Facterra.

      B.  <u>Statute of Limitations</u>

Defendants contend that Plaintiff's sole claim for legal malpractice is barred by Massachusetts' three-year statute of limitations, which accrued, at the latest, by June 17, 2016, when the stipulation of dismissal in the underlying case was filed.  Defendants argue that Plaintiff cannot avail himself of the continuing representation doctrine to avoid this result. Plaintiff's rejoinder is that discovery has unearthed an email from Day to Murphy dated June 30, 2016, clearly demonstrating that Defendants' representation of Plaintiff did not end until after that date, which would render the June 28, 2019, commencement of the instant action timely.

According to Defendants, this email is insufficient to trigger application of the continuing representation doctrine.

State law controls the statute of limitations periods for state law causes of action. *Heinrich ex rel. Heinrich v. Sweet*, 49 F. Supp. 2d 27, 33 (D. Mass. 1999) (citing *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 110 (1945)).  Plaintiff's legal malpractice claim is subject to a three-year statute of limitations.  *See* Mass. Gen. Laws ch. 260, § 4.  Because Plaintiff filed his complaint on June 28, 2019, to be within the statute of limitations, the underlying cause of action must have accrued on or after June 28, 2016.

Under Massachusetts law, a legal malpractice action accrues and "the limitations period begins to run '[o]nce [a] client or former client knows or reasonably should know that he or she has sustained appreciable harm as a result of the lawyer's conduct ….'" *Rosen Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 364 F.3d 399, 405 (1st Cir. 2004) (quoting *Williams v. Ely*, 668 N.E.2d 799, 804 (Mass. 1996)).  Thus, Massachusetts requires that "a plaintiff have (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was."  *Bowen v. Eli Lilly & Co., Inc.*, 557 N.E.2d 739, 742 (Mass. 1990).  "Reasonable notice that a … particular act of another person may have been a cause of harm to a plaintiff creates a duty of inquiry and starts the running of the statute of limitations."  *Id*. at 743.  "This is the so-called discovery rule."  *Lyons v. Nutt*, 763 N.E.2d 1065, 1069 (Mass. 2002).  "A client need not know that his lawyer was negligent for the cause of action to accrue.  He need only know that he 'sustained appreciable harm as a result of the lawyer's conduct.'"  *Id*. at 1070 (quoting *Williams*, 668 N.E.2d at 804).

"The continuing representation doctrine 'tolls the statute of limitations in legal malpractice actions where the attorney in question continues to represent the plaintiff's interests

in the matter in question.'" *Vinci v. Byers*, 837 N.E.2d 1140, 1145 (Mass. App. Ct. 2005)

(quoting *Murphy v. Smith*, 579 N.E.2d 165, 167 (Mass. 1991)).  The doctrine recognizes that a

person who has sought legal assistance has a right to rely on his lawyer's advice and should not

be expected or required to second-guess the attorney's performance for as long as the attorney

continues to represent the client's interests in the matter in question.  *Murphy*, 579 N.E.2d at 168.

The doctrine protects only innocent reliance, however.  *Cantu v. St. Paul Companies*, 514 N.E.2d

666, 669 (Mass. 1987).  Thus, pursuant to the doctrine, if a client continues to be represented by

the lawyer in the same matter and reasonably should know but does not actually know that the

lawyer's conduct has caused him harm, the continuing representation rule continues to apply to

toll the statute of limitations.  *Parr v. Rosenthal*, 57 N.E.3d 947, 961 (Mass. 2016).  On the other

hand, "even where the client continues to be represented by the attorney, the statute of

limitations clock for legal malpractice claims begins when a client *actually* knows that he or she

has sustained appreciable harm as a result of a lawyer's conduct."  *Parr*, 57 N.E.3d at 961.

Where the continuing representation doctrine applies, it tolls the clock running on the client's

legal malpractice claim from the beginning of the attorney's representation until its termination.

*Lyons*, 763 N.E.2d at 1070 (citing *Murphy,* 579 N.E.2d at 168).  The doctrine is intended to

provide a narrow exception to the statute of limitations.  *Cf. Parr*, 57 N.E.3d at 964 (discussing

the application of the continuing treatment exception in medical malpractice cases).

      "Once the defendant pleads the statute of limitations as a defense to a malpractice action

and establishes that the action was brought more than three years from the date of injury, the

burden of proving facts that take the case outside the impact of the statute falls to the plaintiff."

*Riley v. Presnell,* 565 N.E.2d 780, 785 (Mass. 1991) (citing *Franklin v. Albert*, 411 N.E.2d 458,

463 (Mass. 1980)).  *See also Newhall v. Posner*, No. Civ. A. 03-11279-PBS, 2004 WL 413275,

at *2 (D. Mass. Mar. 4, 2004) (citing Riley, 565 N.E.2d at 785).  Here, Defendants have pled the statute of limitations as a defense and established that Plaintiff brought his claim on June 28, 2019, which is more than three years from the latest possible date of injury based on any of Plaintiff's theories of malpractice.[5]  Thus, "[Plaintiff] bears the burden of establishing that [his] claim is timely."  *St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP.*, 379 F. Supp. 2d 183, 196 (D. Mass. 2005), *order confirmed sub nom. St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 408 F. Supp. 2d 59 (D. Mass. 2006) (citing *Riley,* 565 N.E.2d at 785).

Plaintiff disclaims actual knowledge that he had been harmed by Defendants' actions until after he obtained a complete copy of his file sometime after June 28, 2016, and he relies on the continuing representation doctrine to bring his claim within the statute of limitations.

---

[5] In his complaint, Plaintiff alleges that Defendants committed malpractice by: (1) failing to request a continuance before the August 11, 2015, hearing on the State Court Plaintiffs' requests for preliminary relief; (2) failing to file any responsive papers in opposition to the initial state court applications; (3) failing to move for reconsideration of the August 14, 2015, order allowing the State Court Plaintiffs' initial applications, or failing to take an immediate appeal  therefrom and contemporaneously move for a stay of enforcement; (4) failing to effectively and timely oppose the State Court Plaintiffs' application to hold Plaintiff in contempt of court by reason of his technical violation of the terms of the August 14, 2015, order; and (5) failing to take an immediate appeal from the January 21, 2016, order denying Plaintiff's motion to dismiss (Dkt. No. 1 at 8).  Plaintiff's expert identifies a few additional areas of alleged malpractice by Defendants, including: (1) failing to advise Plaintiff at the outset that he should consider hiring separate counsel; (2) after the injunction issued, failing to inquire about Facterra's ability to comply with the injunction or whether it was complying with the injunction; (3) failing to include in the motion to dismiss and to argue that the State Court Plaintiffs' complaint should have been dismissed for failure to state a claim; and (4) advising the State Court Defendants that they had little chance to prevail following the denial of the motion to dismiss (Dkt. 77-16). Based on any of these theories, Plaintiff's appreciable harm was realized at the very latest upon the filing of the stipulation of dismissal when, in Plaintiff's view, the case was settled on disadvantageous terms, and likely much earlier.  Indeed, in his own motion for summary judgment, Plaintiff argues that the state court's rulings on the State Court Plaintiffs' applications for preliminary relief effectively unwound the share transactions with Nancy and Barnard which doomed a roll-up strategy by Facterra and resulted in monetary damages (Dkt. No. 82 at 3).

19

Specifically, in his motion for partial summary judgment, Plaintiff states "there is not one shred of competent evidence discerned through discovery which in any manner lessens [P]laintiff's allegations of … [his] lack of actual knowledge of [EFC's] abject failure to adequately represent him at the August 11, 2015, hearing, along with the other deviations from the applicable standard of care" (Dkt. No. 82 at 17).  The problem with this formulation is that it fails to recognize that because Defendants have plead the statute of limitations and established that Plaintiff's action was brought more than three years from the date of injury, the burden is on Plaintiff to prove facts that take the case outside the impact of the statute.  In other words, Plaintiff cannot rely on allegations to resist summary judgment.  Instead, he must point to evidence satisfying the requirements of Fed. R. Civ. P. 56(c)(1)(A).  To avoid summary judgment against him on statute of limitations grounds based on the continuing representation doctrine, Plaintiff must show that there is a genuine dispute as to whether Defendants continued to represent him and he continued to lack actual knowledge that he had sustained appreciable harm as a result of ECF's representation until at least June 28, 2016.  *See John Beaudette, Inc. v. Sentry Ins. A Mut. Co.*, 94 F. Supp. 2d 77, 106 (D. Mass. 1999) (quoting *Church v. General Electric Company*, Civ. Action No. 95-30139-MAP, 1997 WL 129381 at * 4 (D. Mass. Mar. 20, 1997)) ("'When a defendant files a motion [for summary judgment] contending that [the] plaintiff's claims are time-barred, the plaintiff bears the burden of pointing to facts of record that would justify a factfinder in concluding that the suit is timely.'").  On the record before the court, Plaintiff has not met his burden of proof.

To support his invocation of the continuing representation doctrine, Plaintiff relies on the June 28, 2016, letter from Day to Plaintiff enclosing a copy of the file, a June 30, 2016, email from Day to Murphy, indicating that the check went out with the final statement the previous

day, and an August 3, 2016, letter from Murphy to the Managing Partner at EFC thanking him

for providing a complete copy of the file and giving him the opportunity to put EFC's liability

carrier on notice of a potential claim.  None of these documents show that Plaintiff was in a

position where he did not know that he had been injured and that he continued to rely on ECF's

legal advice.  *See Parr*, 57 N.E.3d at 960 (citing *Lyons*, 763 N.E.2d at 1070).  As to Plaintiff's

knowledge that he suffered appreciable harm, by June 2, 2016, he had expressed his belief that

the settlement the parties reached on April 25, 2016, was a bad deal and that he wanted to back

out because he believed that the State Court Defendants had a strong case (Dkt. No. 86 at 67).

*See Vinci*, 837 N.E.2d at 1145.  While a reasonable factfinder could find that Plaintiff knew he

had suffered appreciable harm resulting from Defendants' actions before June 2, 2016, on this

record, in the absence of some indicia of admissible evidence on this point, no reasonable

factfinder could find that Plaintiff did not know by at least June 2, 2016.  Thus, even if the

continuing representation doctrine is applicable, the longest it could have tolled the statute of

limitations is until June 2, 2016.

But even if Plaintiff were to present evidence that he did not know he had suffered harm

as a result of Defendants' conduct until after June 28, 2016,[6] such that the continuing

representation doctrine could continue to apply, it would end by the latest on June 17, 2016,

when the stipulation of dismissal was filed.  "At this point … [at the latest] the statute of

limitations was triggered."  *Id.* at 1146.  After this date, any further acts by ECF were purely

ministerial in nature.  ECF did not continue to render legal advice in the State Court Action to

Plaintiff.  *See Lyons*, 763 N.E.2d at 1070 (the continuing representation doctrine does not create

---

[6] To be clear, Plaintiff has not submitted such evidence.  While he has alleged and argues that he lacked actual knowledge until after June 28, 2016, the record is devoid of any testimony or an affidavit from Plaintiff to that effect.

a bright-line rule tolling the statute of limitations until the actual date that the attorney-client relationship ends); *cf. Parr*, 57 N.E.3d at 964 (declining to extend continuing treatment doctrine where the defendant doctor was no longer providing medical care to the plaintiff).  The ministerial acts in which ECF engaged on June 28 and 30, 2016, did not toll the three-year statute of limitations because ECF did not continue to provide legal advice to Plaintiff by these communications.

Plaintiff, a lawyer admitted to practice in New York and Massachusetts, had three years from June 17, 2016, or, in other words, to June 17, 2019, to investigate and determine whether he had a basis to bring a legal malpractice case against ECF.  Indeed, he apparently did so, since Thomas Murphy notified ECF by a letter dated August 3, 2016, that ECF should put its liability carrier on notice of a potential liability claim.  Plaintiff nonetheless failed to timely file this case. "The clarity and precision of a limitations period is important to the interests of justice because it enables untimely filed cases to be dismissed before trial, thus sparing all parties the needless time, expense, and burden of a trial where the jury will never reach an adjudication on the merits." *Parr*, 57 N.E.3d at 964.  The court noted at the motion to dismiss stage that Plaintiff's case on the statute of limitations was thin and that the issue could be revisited at summary judgment.  Unfortunately for Plaintiff, he has not identified facts which would allow a reasonable factfinder to conclude that Defendants' representation of Plaintiff extended beyond June 17, 2016.  Thus, Plaintiff's claim is time barred and Defendants are entitled to judgment in their favor. Given this disposition, the court does not reach the parties' arguments on the merits of the legal malpractice claim.

**V.      CONCLUSION**

For the above-stated reasons, Defendants' motion for summary judgment (Dkt. No. 76) is

GRANTED, and Plaintiff's motion for partial summary judgment (Dkt. No. 79) is DENIED.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: September 29, 2022